UNITED STATES

v.

Clayton J. LONETREE, 473 88 6750,
Sergeant (E–5), U.S. Marine Corps.

NMCM 88 2414.

U.S. Navy–Marine Corps Court of
Military Review.

Sentence Adjudged 24 Aug. 1990.

Decided 30 Aug. 1990.*

---

\* Classification review of this decision was completed on 6 September 1990. It was released and distributed on 14 September 1990.

Lee Calligaro, Civilian Appellate Defense Counsel.

Daniel E. Johnson, Civilian Appellate Defense Counsel.

LCDR L. Saccoccio, JAGC, USN, Appellate Defense Counsel.

LT Fredric D. Firestone, JAGC, USNR, Appellate Defense Counsel.

LT Mary Anne Razim, JAGC, USNR, Appellate Defense Counsel.

LT John L. Staley, JAGC, USNR, Appellate Defense Counsel.

LT Wendell M. Sims, JAGC, USNR, Appellate Defense Counsel.

LT Nicholas Fitzgerald, JAGC, USNR, Appellate Defense Counsel.

LT Jacob R. Walker, JAGC, USNR, Appellate Defense Counsel.

LT Jeffrey S. Horwitz, JAGC, USNR, Appellate Defense Counsel.

Capt Dwight H. Sullivan, USMCR, Appellate Defense Counsel.

Capt Michael K. Schaller, USMC, Appellate Defense Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

BYRNE, Chief Judge:

Contrary to his pleas, Sergeant Clayton J. Lonetree, U.S. Marine Corps, was convicted of 13 violations of the Uniform Code of Military Justice (UCMJ).[1] In essence, he was convicted of: identifying (by names, addresses, telephone numbers, and by photographs) covert United States intelligence agents to Soviet agents; of providing the floor plans and office assignments of personnel in United States Embassies in Moscow, USSR, and Vienna, Austria, to Soviet agents; of conspiracy to commit the above offenses; and of failure to report contacts with citizens of communist controlled countries. The members sentenced Sergeant Lonetree to be confined for 30 years, to be fined $5,000.00, to be reduced to pay grade E–1, to forfeit all pay and allowances, and to be dishonorably discharged. The convening authority reduced Sergeant Lonetree's confinement to 25 years, did not approve the fine, but otherwise approved the sentence.

Sergeant Lonetree, who was described as a loner, first met Violetta Seina, a young comely Soviet woman in a Moscow subway station. This "chance" meeting was to signal the start of a long journey into espionage for Sergeant Lonetree.

Sergeant Lonetree was serving as a Marine Security Guard at the U.S. Embassy in Moscow when he met Violetta (a Soviet employee at the Embassy). He had consistently expressed an admiration for totalitarian regimes and their intelligence services (especially the Soviet KGB). In Sergeant Lonetree's case, at least, he validated his perception of the KGB's reputation, for they apparently had determined he was philosophically and emotionally attuned for a sexual liaison which would lead to espionage. He was and he did. Sergeant Lonetree sought to extricate himself from the Soviet web only after he had committed numerous acts of espionage.

Symmetry and practicality require a variance from the order of appellant's assignments of error. We do not address appellant's assignment of error V pertaining to Specifications 1 and 2 of Charge II as we have dismissed those specifications, among others, as multiplicious for findings.

I

CLOSURE TO THE PUBLIC

The military judge, pursuant to a motion by the Government sought under Military Rule of Evidence 505(j)(5)[2], excluded the

---

1. Three Article 81, UCMJ, 10 U.S.C. § 881, offenses; four Article 92, UCMJ, 10 U.S.C. § 892, offenses; five Article 134, UCMJ, 10 U.S.C. § 934, offenses; and one Article 106a, UCMJ, 10 U.S.C. § 906a, offense.

2. *"Closed Session:* If counsel for all parties, the military judge, and the members have received appropriate security clearances, the military judge may exclude the public during that por-

public during the complete testimony of some witnesses and a portion of the testimony of other witnesses. Sergeant Lonetree contends that these repeated closures denied him his right to a public trial under the Sixth Amendment of the U.S. Constitution for several reasons: (A) the military judge failed to find specific overriding national security interests each time the court was closed; (B) the military judge failed to narrowly tailor the closure each time the court was closed; and (C) the military judge failed to *sua sponte* instruct the members against giving undue weight to evidence admitted in closed sessions.

The Government presented two supporting affidavits to close portions of the trial: Appellate Exhibits II and III. The first affidavit's factual summary stated:

> Certain witnesses to be called by the government are professional intelligence officers. All of these officers will provide testimony on classified matters. A list of these officers, and the government's rationale for requesting that they testify in closed session, is set forth in an Affidavit, classified Secret, provided in support of this motion. All parties, members and the Military Judge, will have received appropriate security clearances.

The Government also sought to protect certain specified intelligence sources and methods. The justification for closure to the public when the intelligence officers were testifying and/or when this specified information was presented is contained in Appellate Exhibits II and III.

The practical effect of the judge's ruling was that some intelligence agents testified in closed sessions and that the testimony of a number of other witnesses was divided between closed sessions and open sessions which the general public could attend.[3] Either party would ask for a closed session when they were going to question a wit-

ness about matters the military judge had ruled were classified. Consequently, it was not the Government that controlled public access to the trial, as appellant asserts, but the military judge.

### A. Each Closure Does Not Require Findings

■ Appellate defense counsel, citing *United States v. Grunden*, 2 M.J. 116 (C.M.A.1977) and *United States v. Hershey*, 20 M.J. 433 (C.M.A.1985), contend that the military judge relinquished and delegated his responsibilities to the prosecution by refusing to make judicial findings justifying closure of the court-martial to the public *each time* such a closure occurred. Such judicial findings for each closed session are not required. Mil.R. Evid. 505 is directed towards the *information* sought to be exempted from disclosure at a public trial. *See* Mil.R.Evid. 505(i)(4)(A) and (C). As the information may be divulged by a number of witnesses or documents, or both, the focus of exclusion is upon that specific information. Consequently, the specificity required addresses the information to be protected, not through what method it is disclosed. In contrast, rights of privacy of individuals such as were involved in *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), focus upon individual rights requiring particularized rulings as to each individual situation. To require a military judge to make specific findings each time a series of questions is to be asked of a witness, after the judge had already determined the responses were classified, would be to create unnecessary and disruptive bifurcation of the trial and constitute an exercise in redundancy. The confusion would make a difficult trial an incomprehensible one and would be the antithesis of a fair and orderly proceeding within the context of the facts of this case.[4]

tion of the testimony of a witness that discloses classified information."

**3.** The appellant alleges some 25% of the testimony was taken in closed session. The test is the merit of the public's exclusion, not percentages. *United States v. Grunden*, 2 M.J. 116, 120 n. 2 (C.M.A.1977).

**4.** We note the appellant's counsel were the first to request a closed session (to cross-examine a prosecution witness who had just testified in open session) (R. 1052) and then later concurred in a bifurcated presentation of a Government witness' testimony with direct and cross-examination in open session followed by a

We do not believe *Grunden* mandated judicial findings for each closed session when the Court of Military Appeals stated that "limited portions" of a court-martial may be partially closed despite defense objection but in "each instance the exclusion must be used sparingly with the emphasis always toward a public trial." *Id.* at 120. Rather, as we noted regarding Mil.R.Evid. 505, the Court was addressing *individualized decision-making* as to *specific information* which the Government asserts must be exempted from disclosure at a public trial whenever that information is presented during the course of the trial. Further, we find nothing in *Hershey* that delineates such a requirement.

The appellant cites an editorialized version of dictum in the First Amendment opinion of *United States v. Pelton*, 696 F.Supp. 156, 159 (D.Md.1986), *aff'd*, 835 F.2d 1067 (4th Cir.1987), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988), that more than a label of national security is required prior to closing a court to the public. In *Pelton*, as in Sergeant Lonetree's trial, however, affidavits were presented setting forth valid reasons for the classification of the information and why it could not be revealed in public session. Further, the military judge in the present case, and the judge in *Pelton*, both conducted their own analysis of the affidavits and the interests at stake. *See* R. 39–41 and *Pelton*, at 158–59.

We find the military judge properly analyzed and balanced the competing interests before ordering the closing of the court to the public when specified classified information was to be presented. Each individual closure did not precipitate a requirement for findings.

### B. The Closures Were Adequately Tailored

■ Appellant contends that as the military judge "failed to make specific findings concerning the need for closed proceedings each time the Government so requested, the portions of the trial which he did close were not narrowly tailored to limit the intrusion upon appellant's Sixth Amendment

closed session composed of further direct and

right. The extent of the closed proceeding was simply left to the discretion of the trial counsel." Appellate Defense Brief, 41–42.

We believe the closure procedure utilized in this case was the fairest and most practical that could be devised. The extent of the closures was determined by *either* Government or defense. The military judge had already determined which information, because of its classified status, would be presented in closed sessions. The fact that certain unclassified information was disclosed by individuals whose duties and identities could not be publicly matched-up was necessary to protect classified information. Further bifurcation of other witnesses' testimony, other than as occurred, was impracticable and would have created unnecessary chaos. In fact, the apparent inadvertent disclosure of classified information by both parties in public sessions occurred rather frequently despite the efforts of the court to ensure nondisclosure. The procedure utilized allowed both parties a reasonably normal context within which to pursue their respective positions.

### C. Instructional Requirements

■ Two instructions, required by *Grunden*, were not given to the members by the military judge.

In *Grunden*, the Court of Military Appeals noted that the

bifurcated presentation of a witness' testimony is the most satisfactory resolution of the competing needs for secrecy by the government and for a public trial by the accused. It will be incumbent upon the trial judge to sua sponte instruct the court members both as an introductory matter and in greater detail during his final instructions as to the underlying basis for the use of this bifurcated process. It is imperative that the court members determine whether the documents or information in question are violative of the espionage statute based solely upon the evidence presented. Neither the utilization of a particular document marking, nor the presentation of certain testimony in closed sessions can

cross-examination (R. 1098).

be, in and of itself, sufficient to sustain a conviction.

*Grunden,* at 123–24.

The Court of Military Appeals principally relied on dictum in *United States v. Drummond,* 354 F.2d 132, 152 (2nd Cir.1965), in framing this requirement. Drummond was convicted of conspiracy to violate the Federal Espionage Act, 18 U.S.C. § 794(c). In *Drummond* all four admitted prosecution exhibits made reference to an element that was at issue in the trial as each bore the legend: "This material contains information affecting the national defense of the United States, within the meaning of the Espionage Laws, Title 18, U.S.C., §§ 793 and 794...." *Drummond* opined that a limiting instruction (which was given) would have been mandated under these particular facts except that the legend *was* admissible to show whether Drummond conspired to transmit the information "with intent or reason to believe" that it would hurt the United States or help a foreign nation, an essential element of 18 U.S.C. § 794. *Drummond,* at 152.

In the appellant's case, no prosecution exhibit that itself was alleged to have been stolen by appellant was admitted for consideration by the members. Further, no prosecution exhibits had stamped legends that established an element of the offense. One document (Prosecution Exhibit 29) (which was similar to one alleged to have been copied by appellant) had classification markings on its cover, but those markings were relevant as to intent or knowledge on appellant's part. *See id.* Nonetheless, although *Drummond* is distinguishable, the Court of Military Appeals explicitly required in *Grunden* that the members be *sua sponte* instructed that the use of a nonpublic session to present information is not itself evidence that the information is classified. No such instruction was given, and therefore, this omission constituted error.

■ Footnote 21 at page 124 of *Grunden* reflects a second instructional requirement:

It must be apparent that exclusion of the public during a trial may cause some court members to erroneously conclude that as the witness or document needs protection, the testimony must be true, and therefore, the defendant's innocence is to be doubted. Note, *Exclusion of the General Public From A Criminal Trial—Some Problem Areas,* 1966 Wash.U. L.Q. 458. *See* Quick, *A Public Criminal Trial,* 60 Dick.L.Rev. 21, 28 (1955). The fears expressed by the Supreme Court in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that jurors cannot understand the policy consideration calling for the given exclusion are applicable to this situation. Hence, cautionary instructions tailored to the facts of the particular case are mandated lest the very purpose behind the procedures discussed be thwarted.

Footnote 21 requires an instruction that information presented or testimony heard in closed sessions be given no more weight by virtue of the closed forum in which the evidence is presented than the other evidence presented at trial. Therefore, error again occurred when this second instruction was not given.

■ While error, there was no prejudice, because the weight of the evidence against Sergeant Lonetree was so overwhelming that the failure to give the instructions had no effect upon the findings. *See United States v. Davis,* 26 M.J. 445 (C.M.A.1988).[5]

## II

## CONFRONTATION AND CROSS–EXAMINATION OF THE JOHN DOE WITNESS

Appellant alleges that he was denied his Sixth Amendment right to confront and thoroughly cross-examine a Government witness. Before trial the Government moved under Mil.R.Evid. 505 to prevent

---

5. Assuming, *arguendo,* that these instructional omissions were of constitutional dimension, which we doubt, we also conclude that they were harmless beyond a reasonable doubt. *See United States v. Davis,* 26 M.J. 445, 449 n. 4 (C.M.A.1988).

disclosure to the defense of specified classified information concerning the "John Doe" witness and to preclude cross-examination as to that information.[6] The Government offered a top secret affidavit to support invoking the classified information privilege. Appellant Exhibit VII. Another document, classified secret, that contained John Doe's report on the observation of a suspected KGB agent was also not disclosed to the defense. The military judge ruled as to this second document that a redacted version of the report was a sufficient substitute for disclosure to the defense.

In opposing the Government motion the defense requested that the information be disclosed and that normal cross-examination be permitted, albeit in a closed session. The Government countered by asserting that using the precautions of a pseudonym and a closed session were not adequate to protect the classified information concerning John Doe's deep-cover and that the civilian defense counsel did not possess the necessary top secret clearance to access the information.[7]

After reviewing the affidavit and the secret report *in camera*, the military judge ruled that the defense was not entitled to discover the classified information and, further, that they would not be allowed to cross-examine John Doe concerning his true name, address, and other background information. Also excluded from defense discovery and cross-examination was information concerning whether John Doe had been aided or assisted by any other covert agents in observing a suspected KGB officer who was identified in a photograph by the appellant. The military judge's ruling in pertinent part is set forth:

So, from a reading of the affidavit in camera, it is my determination that this information can be restricted, a pseudonym can be used, and the cross-examination can otherwise be limited without prejudicing the rights of the accused. The third issue would be, should the Court make that decision without showing the evidence to the defense and the reasons why that should be done. The defense said, we're not shown. The reasons are contained in the affidavit. For the record, I would note that the reasons are sufficient. Therefore, I will make the ruling without further ruling that the government needs to disclose the affidavit to the defense.

So, the motion of the government in this respect is granted. A pseudonym may be used. The restrictions requested on the scope of cross-examination, that is to say questions which would tend to disclose the protected background and activities is granted as well.

R. 59.

*See also* R. 797–809 and Appellate Exhibits XCV, XCVI, and XCVII.

### A. The Military Standard

The use of classified information in a court-martial is controlled by the procedures and standards set forth in Mil.R. Evid. 505. Germane to this appeal are the subdivisions that authorize a military judge to limit or prevent disclosure to an accused of classified information. Mil.R.Evid. 505(g)(2) is applicable when the Government needs to limit or prevent disclosure.

(2) *Limited Disclosure.* The military judge, upon motion of the Government, shall authorized [sic] (A) the deletion of specified items of classified information from documents to be made available to

---

6. Even though the appellant only asserts as error the restriction placed on his right to cross-examine John Doe, it is obvious that the nondisclosure of the classified information in question during discovery also impacted upon the appellant's right of confrontation. *Cf. United States v. De Los Santos,* 810 F.2d 1326, 1334 (5th Cir. 1987). We, therefore, will view the limitation placed on discovery as indivisible with the limitation placed on cross-examination.

7. The military judges's ruling that the classified information would not be disclosed to the defense eliminated the potential issue of whether the clearances given to the civilian defense counsel were adequate to allow them the access to the evidence to prepare the appellant's case. *See United States v. Nichols,* 8 U.S.C.M.A. 119, 23 C.M.R. 343 (1957). Furthermore, no allegation has been made by the defense counsel that a lack of a higher clearance prohibited them from effectively representing the appellant.

the defendant, (B) the substitution of a portion or summary of the information for such classified documents, or (C) the substitution of a statement admitting relevant facts that the classified information would tend to prove, unless the military judge determines that disclosure of the classified information itself is necessary to enable the accused to prepare for trial. The Government's motion and any materials submitted in support thereof shall, upon request of the Government, be considered by the military judge in camera and shall not be disclosed to the accused.

In making a motion to prevent or limit disclosure of classified information, "the Government shall submit the classified information for examination only by the military judge and shall demonstrate by affidavit that disclosure of the information reasonably could be expected to cause damage to the national security in the degree required to warrant classification under the applicable executive order, statute, or regulation." Mil.R.Evid. 505(i)(3). Once the Government has met this standard, then the "military judge shall determine whether the information may be disclosed at the court-martial proceeding." Mil.R.Evid. 505(i)(4).

■ Mil.R.Evid. 505(i)(4)(B) contains the standard to be employed by a military judge to determine when classified information must be disclosed to the defense.[8] The general rule contained in Mil.R.Evid.

505(a), that classified information is privileged, will control unless the information, as determined by the military judge, is "relevant and necessary" to an element of the offense or to a legally cognizable defense.[9]

### B. Background and Purpose of Mil.R.Evid. 505

The analysis to Mil.R.Evid. 505 states that the rule is based upon the proposed House version of the Classified Information Procedures Act (CIPA), 18 U.S.C.App. §§ 1–16 (1982), and the Supreme Court's discussion of the executive privilege in *United States v. Reynolds*, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[10] *See* Maher, *The Right To A Fair Trial In Criminal Cases Involving The Introduction Of Classified Information*, 120 Military Law Review 83, 101–102, Spring 1988. The rule was proposed by the Executive Branch to combat the problem of "graymail". Graymail occurs when an accused seeks discovery or disclosure of sensitive national security information for the purpose of forcing the Government to discontinue prosecution to safeguard the information. *See, e.g., United States v. Smith*, 780 F.2d 1102, 1105 (4th Cir.1985). Mil.R.Evid. 505 attempts to eliminate this problem by balancing the "interest of an accused who desires classified information for his or her defense and the interests of the Govern-

---

8. The standard for discovery of information requested by an accused is contained in Rules for Court–Martial (R.C.M.) 701, Manual for Courts–Martial (MCM), United States, 1984. Information will be disclosed to the defense when it is material to the preparation of the defense, intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial, or was obtained from or belongs to the accused. However, R.C.M. 701(f) limits this standard by preventing disclosure of any information protected by a privilege contained in the Military Rules of Evidence.

9. This standard is also contained in R.C.M. 703. However, as we discuss *infra*, the manner in which the relevant and necessary standard is applied in R.C.M. 703 is different than as applied to Mil.R.Evid. 505.

10. The *Reynolds* case was a civil action in which classified information was requested by private citizens from the United States Air Force. The Supreme Court broadly delineated the executive privilege pertaining to classified information and held that the information was not discoverable. In a caveat the Court noted two Circuit Courts have held that in a criminal trial "it is unconscionable to allow [the Government] to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." *Reynolds*, 345 U.S. at 12, 73 S.Ct. at 534, 97 L.Ed. at 735 (citations omitted).

In *Nixon*, a criminal case, the Supreme Court noted, in dictum, citing *inter alia, Reynolds,* that the courts have traditionally shown the utmost deference to the classified information privilege.

ment in protecting that information." Analysis, Mil.R.Evid. 505, Manual for Courts–Martial, United States, 1984, A22–37.

### C. Federal Precedent

The two leading pre-Mil.R.Evid. 505 and pre-CIPA cases that have reversed criminal convictions for violations of the Sixth Amendment because the defense was denied background information on which to base effective cross-examination of Government witnesses are *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) and *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). In *Alford* the Supreme Court carefully pointed out that the witness whose identity was not disclosed to the accused might have been in prison himself, a condition which would significantly impact on his credibility. *See United States v. Alston*, 460 F.2d 48, 51 (5th Cir.1972). Therefore, it was error for the Government to have restricted the defense from inquiring into this possible fertile area on cross-examination.

In *Smith* the primary Government witness did not reveal his real name or home address, testified under an alias, and because he was without an occupation the defense was left with nothing on which to attempt to contradict or impeach the witness on cross-examination. *See Alston*, at 51. Furthermore, the Government failed to present any justification for preventing the defense from receiving the information and conducting usual and proper cross-examination. It was the lack of any justification that was of particular significance to Justice White who, in his concurrence, which he believed was consistent with the majority view, opined that had the Government been able to show the limitation on the defendant's cross-examination was necessary to protect the personal safety of the witness then it would be permissible for a trial judge in the exercise of his discretion to limit cross-examination. *Smith*, 390 U.S. at 134, 88 S.Ct. at 751, 19 L.Ed.2d at 960.

The *Alston* court, in applying the holdings of *Alford* and *Smith*, found it significant that the undisclosed witness was a Government agent who, under an obligation to provide information and subject to official supervision, was still involved in ongoing undercover work. The Court reasoned that because the witness was a Government agent there was a reduced need to require background information than there would be for an informant-witness, whose motives or background would be subject to greater scrutiny and possible doubt. Even more important to the Court, the inherent dangers of ongoing undercover work gave rise to the reasonable inference that disclosure of the witness' background information could be restricted unless the defense showed a "sufficient likelihood" that revealing the information "would provide a significant avenue for additional cross-examination." *Alston*, at 53. Accordingly, because the defense was nevertheless able to place the witness within the context of his occupation as a Government agent for purposes of cross-examination, it was not a violation of the Sixth Amendment for the Government to have withheld the home address of the witness.[11]

■ We agree with the Fifth Circuit in *Alston* that *Alford* and *Smith* do not create a *per se* rule of disclosure of a witness' background. Instead, the witness should have the opportunity to demonstrate to the trial Judge that disclosure of his background would endanger himself. It would then be necessary for the judge to determine whether the defense has been prejudiced by not being able to pursue a fertile

---

**11.** The Fifth Circuit in holding that there was no violation of the Sixth Amendment stated:

We conclude that, for purposes of the Sixth Amendment, a witness may be constitutionally "placed" through disclosure of his or her occupational background and existing occupational circumstances without concomitant disclosure of a home address, if there is sufficient reason advanced by the witness for non-

disclosure and unless the defendant raises sufficient likelihood that disclosure of the home address would provide a significant avenue for additional cross-examination. Unlike the defendants in *Smith* and *Alford*, Alston could readily "place" Agent Johnson within the context of his occupation.

*Alston*, at 53.

avenue of cross-examination by placing the witness in his proper setting for purposes of qualification, contradiction and impeachment. The Sixth Amendment is violated when an accused has been prejudiced by not being able to place an adverse witness in his proper setting. *Alston*, at 52. Therefore, we hold that even though an accused has the right under the Sixth Amendment to require disclosure of background information of a Government witness, such a right "is not, like a rule of plane geometry, absolute." *McGrath v. Vinzant*, 528 F.2d 681, 684 (1st Cir.1976).

Since the disclosure right is not absolute, it is necessary to determine when the Government may constitutionally invoke a privilege that withholds information from an accused during discovery and limits cross-examination of a Government witness. In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court stated two requirements that must be satisfied before the Government will be allowed to invoke the informant privilege. First, the privilege must be applicable to the circumstances of the case and not be limited by its underlying purpose. Accordingly, if the information to be protected is already known to an accused and can no longer be protected, then the privilege cannot be invoked. Second, based on notions of fundamental fairness, when the information is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. at 628, 1 L.Ed.2d at 645. With respect to when the privilege must give way, the Court stated that no fixed rule is justifiable but instead it is necessary to balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* 353 U.S. at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646. This balancing determination depends on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the information, and any other relevant factors.

After finding that the privilege applied in *Roviaro*, the Supreme Court nevertheless reversed the conviction because they held that the balancing determination required disclosure because the identity and testimony of the informant was deemed "highly material", "highly relevant", and "might have been helpful to the defense." The charge that was before the Court involved whether the defendant "fraudulently and knowingly" received, concealed, bought and facilitated the transportation and concealment after importation of heroin. The informant was alone with the defendant during the "crucial occurrence" alleged in the charge. The informant was not "produced, identified, or otherwise made available" to the defense and the Government witnesses were prevented from answering questions on cross-examination concerning the informant. The Court after noting exactly how the informant might have been helpful to the defense held:

> This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that [John] Doe denied knowing petitioner or ever having seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure.

*Roviaro*, 353 U.S. at 64–65, 77 S.Ct. at 630, 1 L.Ed.2d at 647.

The "relevant and helpful to the defense" standard enunciated by the Supreme Court in *Roviaro* has also been utilized in determining when classified information is not discoverable in the face of the Government asserting its classified information privilege. In *United States v. Yunis*, 867 F.2d 617 (D.C.Cir.1989), the accused was the focus of an investigation into the hijacking of a Royal Jordanian Airline flight. During the investigation, recordings of conversations between the accused and a Government informer were made by some "undisclosed law enforcement intelli-

gence-gathering source or method." Prior to trial the accused requested discovery of the classified recordings but the Government objected and invoked the classified information privilege. In reversing the trial court's order that the information requested must be disclosed to the defense, the Court stated:

> After reviewing the transcripts *in camera,* we hold that the contents of the transcripts were on the whole not relevant to the defendant's guilt or innocence and the few statements that were even marginally relevant were not sufficiently helpful or beneficial to the defense to overcome the classified information privilege.

*Yunis,* at 618.

The Court of Appeals began their analysis by noting that the CIPA procedures, without creating new rules of admissibility of evidence, protect a Government privilege similar to the informant's privilege in *Roviaro.* Therefore, when the accused requested privileged information that the Government sought to protect by the classified information privilege a stepped-analysis was triggered. First, the accused must show that the information sought is "relevant." This normally low threshold requirement is not satisfied by a mere showing of theoretical relevance in the face of the Government's colorable claim of privilege. In *Yunis,* the Court determined that the trial court was only able to find theoretical relevance because the information sought did not go to the innocence of the accused *vel non,* impeach any evidence of guilt, or make more or less probable any fact at issue in establishing any defense to the charges. However, the Court afforded the accused the near presumption that his own statements were relevant but continued that "we still find that the *ex parte* showing falls far short of establishing the helpful or beneficial character necessary to meet the second step of the test." *Yunis,* at 624.

The second step in the analysis requires the accused to show that the privileged information is "material." In deciding the information was not material, the Court

equated materiality with the Supreme Court's use of the phrase "helpful to the defense of an accused" as found in *Roviaro* and opined that this phrase provided better guidance in a trial context than the term "material." *Yunis,* at 625. Furthermore, in footnote #9 the Court examined the full quotation in *Roviaro* of "helpful to the defense of an accused, or is essential to a fair determination of a cause" and stated that it "would seem apparent that evidence 'essential to a fair determination of a cause' creates a different situation than either the case where information is not helpful or merely helpful." The "essential" aspect of the quote, in the Court's opinion, might involve due process considerations that the "relevant and helpful" part of the quote did not. The Court clearly felt that the two parts of that quotation even though separated by the word "or" contain two different standards and not merely alternative ways of restating the same standard.

For the third and final step in the analysis, the Court noted that other circuits when faced with the issue have applied the *Roviaro* balancing of needs to a CIPA determination. However, because they found the requested information was "no more than theoretically relevant and w[as] not helpful to the presentation of the defense or essential to the fair resolution of the cause" the Court declined to either adopt or reject this final step in the analysis. *Yunis,* at 625.

Even though the Court in *Yunis* declined to apply the balancing of needs test, we do note that they chastised the trial judge for the manner in which he performed the balancing of needs test because he misapprehended "the nature of the sensitive information the government sought to protect." The Court in pertinent part stated:

> Our own review of the government's affidavits and transcripts reveals that much of the government's security interest in the conversation lies not so much in the contents of the conversations, as in the time, place, and nature of the government's ability to intercept the conversations at all. Things that did not make sense to the District Judge would make

all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence gathering capabilities from what these documents revealed about sources and methods. Implicit in the whole concept of an informant-type privilege is the necessity that information-gathering agencies protect from compromise "intelligence sources and methods."

*Yunis*, at 623. The legitimate and compelling interest of the Government to protect "both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service" was found by the Court to be a necessary factor in analyzing whether classified information is discoverable. *Id.*

Finally, even though the Court in *Yunis* declined to decide on the applicability of the balancing of needs test, other circuits have incorporated the balancing of needs test into the determination of when classified information will be disclosed to an accused under the procedures established by Congress in CIPA. In *United States v. Sarkissian*, 841 F.2d 959 (9th Cir.1988), after a challenge by the accused that it was forbidden to balance national security concerns against the accused's need for documents, the Court stated that such a balance was intended by Congress. Therefore, the Court held that the pretrial procedures of CIPA, in order to protect classified information, permit a trial judge to restrict discovery and to limit admission of national security information at trial. *Id.* at 965; *see, e.g., United States v. Smith*, 780 F.2d 1102 (4th Cir.1985) (*en banc*).

D. Meaning of Mil.R.Evid 505 Standard

 The Federal precedents that have incorporated the *Roviaro* standard and the balancing of needs test into CIPA are legally sound and sufficiently persuasive for us to utilize their holdings in applying the "relevant and necessary" standard in Mil.R.Evid. 505. This incorporation of the balancing of needs test into Mil.R.Evid. 505 is consistent with the drafters' intent that the rule "attempts to balance the interests of an accused who desires classified information for his or her defense and the interests of the Government in protecting that information." Analysis, Mil.R.Evid. 505, MCM, A22–37. Furthermore, we do not believe, as one commentator suggests, that the relevant and necessary standard of Mil.R.Evid 505 is, in application, the same standard as used in R.C.M. 703.[12] The underlying purpose of the two rules are vastly different. To paint these two rules possessing vastly disparate purposes with the same judicial brush would thwart the intent of the Executive Branch to combat the problem of graymail.[13] There is no logical reason to interpret the relevant and necessary standard of Mil.R.Evid. 505 differently than the relevant and helpful or essential standard enunciated by the Supreme Court in *Roviaro* because their purposes are the same, *i.e.*, whether the Government may lawfully invoke a privilege. Accordingly, as the Court did in *Yunis*, we equate the "relevant and helpful" phrase of *Roviaro* with the "relevant and material" standard in R.C.M. 505(i)(4)(B), and further, we conclude that "essential to a fair determination of a cause" is equivalent to the Manual's standard of "necessary to an element of the offense or a legally cognizable defense."

E. Holding

 In applying the first step of the analysis found in Mil.R.Evid. 505(i)(4)(B), we hold that the background information concerning the John Doe witness and the information as to whether he was assisted by any other covert agents was properly withheld from the appellant because it was

---

12. S. Saltzburg, L. Schinasi and D. Schueter, Military Rules of Evidence Manual, 456 (2nd Ed.1986).

13. We also note that the discussion to R.C.M. 703(b)(1) defines necessary as "not cumulative and when it would contribute to a party's pre-

sentation of the case in some positive way on a matter in issue." This certainly is different than the standard contained in Mil.R.Evid. 505(i)(4)(B) of "relevant and necessary to an element of the offense or a legally cognizable defense."

not relevant and material in the face of the Government's privilege. The appellant's Sixth Amendment rights were not violated when he was prevented from cross-examining John Doe concerning this classified information when it would not have been helpful to his cause. At trial, the appellant could only offer theoretical relevance for wanting to discover and then cross-examine John Doe on his true identity and whether he had been assisted by any other agents. We find that this information would not have negated the guilt of the appellant which was over-whelmingly proven at trial. John Doe was not the primary or sole Government witness who could testify as to the appellant's criminal activities as in *Roviaro*. Rather, he was a corroboration witness who was tasked with simply observing whether a suspected Soviet KGB officer, previously identified in a picture by the appellant, would appear at a given time and at a given location. *See, e.g., United States v. Harley*, 682 F.2d 1018 (D.C.Cir. 1982). John Doe's background as contained in the top secret affidavit contained nothing concerning John Doe that could have led to a fertile area for cross-examination on which he could have been impeached. Furthermore, after reviewing the secret report on John Doe's observation of the KGB agent, we are convinced that whether John Doe was assisted by others in observing the KGB officer would not have made more or less probable any fact at issue in appellant's establishment of a defense. In finding that it was not error for the trial judge to have withheld disclosure of the classified information to the defense and to have prevented cross-examination on that information, we have been mindful of the dangers inherent in ongoing undercover work in a foreign country that trigger a compelling governmental interest to protect the identity of the undercover agent and the intelligence resources and methodologies used by that agent which could lead to his exposure.

The only time the classified information concerning John Doe's observation of the KGB agent became relevant was when the appellant tried to impeach John Doe concerning a prior inconsistent statement he had made during a pretrial interview with the defense investigator. However, upon reviewing the top secret affidavit, we have applied the balancing of needs test and have determined that the needs of the Government to safekeep the information outweighed the needs of the defense to attempt impeachment since it was not "essential for a fair determination of a cause", *Roviaro*, 353 U.S. at 61, 77 S.Ct. at 628, 1 L.Ed.2d at 645, or "necessary to an element of the offense or a legally cognizable defense", Mil.R.Evid. 505(i)(4)(B). Furthermore, even if it was error for the appellant to have been prevented from attempting to impeach John Doe, we find that any impeachment that might have resulted would have been *de minimus* at best, and therefore, the error, if any, is harmless.

In holding that the military judge did not err in his application of Mil.R.Evid. 505, we further find that the defense was in all other respects fully permitted to place John Doe in the setting in which he observed the Soviet KGB officer. The cross-examination of John Doe constituted numerous pages of the record of trial. The defense fully probed whether John Doe's testimony concerning his observations of the KGB officer may have been incorrect or fallible by inquiring into the lighting and weather conditions, the distance at which the observations were made, any possible distractions, and the age of the photo John Doe was given to identify the KGB agent. The appellant was not prejudiced by the restrictions placed on cross-examination. Accordingly, because we find that the classified information in question was not relevant and necessary to an element of the offense or to a legally cognizable defense, no violation of the appellant's Sixth Amendment rights occurred.[14]

14. The essential substance of John Doe's testimony was testified to by another witness, without objection. R. 1240. Even without this witness' testimony, or John Doe's testimony, appellant's confessions were corroborated.

The trustworthiness-corroboration test enunciated by the Court of Military Appeals in *United*

## F. Instructional Error

■ During John Doe's cross-examination, the defense asked a question which received a response, "I cannot answer that question." We pick up the record from there:

CC (Mr. Kunstler): I'd ask for a direction to answer, Judge. I think that we're just being foreclosed from cross-examination.

TC: Your Honor, as defense counsel well knows, he's going back into an area which was litigated prior to this hearing, he knows that because he was there, and he knows that because Your Honor already advised him of it again in this hearing, today.

(Defense counsel conferred privately.)

TC: It's also not relevant.

MJ: Well, maybe we should take out a few moments at this time to deal with some of the problems that seem to be arising. Let me give some information to the members of the Court concerning the procedure we're dealing with here. As you've been able to tell, the witness here is not testifying under his correct

---

*States v. Rounds*, 30 M.J. 76 (C.M.A.1990) and *United States v. Melvin*, 26 M.J. 145 (C.M.A. 1988), is our present applicable standard.

We note the following nonexclusive corroborating facts and the precedents that merits their consideration as corroboration.

The appellant's "profile" was consistent with an individual who could be recruited by the KGB. R. 1035–36; 1091; 1294; 1321; 1322; 1329–30; 1618, 1631; 1635–46; P.E. 51. *Cf. Melvin* at 147.

The manner by which appellant asserts he was recruited conformed to KGB recruitment practices. R. 1631–65. P.E. 35; *Id.*

Sergeant Lonetree admired the KGB. He loved Violetta, a Russian citizen employed at the U.S. Embassy in Moscow. *United States v. Wagner*, 20 M.J. 758, 762 (AFCMR 1985). In Vienna, he purchased a pair of shoes and a "very expensive" dress (R. 1312) as gifts for Violetta. *Id.* In Vienna, Sergeant Lonetree possessed pictures and letters from Violetta in Moscow. He did not report his contacts with the KGB or Violetta as he knew he was required to do. Sergeant Lonetree had the access and opportunity to commit the offenses. *Rounds*, at 80; *Wagner*, at 762. The two Russians, one assigned to Moscow and one to Vienna, who Sergeant Lonetree believed were KGB agents, were confirmed to be KGB agents. *Melvin*, at 147. Sergeant Lonetree received a jewelry box departure gift from one of the KGB agents (Uncle Sasha). *Id.* He received gifts from Uncle Sasha and desired to give gifts in return. The existence of locations in Vienna, where Sergeant Lonetree admitted meetings occurred, was confirmed. *Id.* In Vienna, the KGB demanded Sergeant Lonetree provide them with more information. *United States v. Hughes*, 28 M.J. 391, 396 (C.M.A.1989); *Melvin*, at 147. Violetta entreated Sergeant Lonetree to be "kind" to the Moscow KGB agent (Uncle Sasha) when he visited Sergeant Lonetree in Vienna. *Melvin*, at 147. Uncle Sasha visited Lonetree in Vienna. *Id.; United States v. Baran*, 19 M.J. 595, 599 (AFCMR 1984). Sergeant M is a recovering alcoholic (he was identified as such to Sasha by Sergeant Lonetree). In Vienna, Sergeant Lonetree feared apprehension and prison by U.S. authorities and also feared the KGB. *Hughes*, at

396. On 6 December 1986, Sergeant Lonetree was telephoned at the Vienna Embassy by an individual with a European accent who confirmed they were to meet that night and suggested the sergeant make his appointed meeting "this time." R. 1548.

Sergeant Lonetree's activities in Vienna were consistent with those of a recruited Soviet agent (R. 1035–36):

1. He took private Russian language classes in Vienna after he had transferred from Moscow. *Melvin*, at 147.
2. He possessed a book on spying. *Wagner*, at 762.
3. Sergeant Lonetree requested leave for a time the KGB wanted him to surreptitiously visit Moscow. *Melvin*, at 147.
4. Sergeant Lonetree continually expressed a desire to join the U.S. Foreign Service and return to Moscow. *Id.*

Lists of Vienna meeting sites, guidance for Sergeant Lonetree, exhibited Cyrillic writing characteristics. *Melvin*, at 147; *Baran*, at 599.

Sergeant Lonetree possessed a list he made of some of the very information he is alleged to have disclosed. *Melvin*, at 147; *Cf. United States v. Henken*, 13 M.J. 898 (NMCMR 1982).

Sasha received a "big promotion" in the Spring of 1986. R. 1742.

We conclude that the evidence within the record of trial "dovetails" with Sergeant Lonetree's pretrial statements. *Melvin*, at 147.

We conclude, applying *Melvin*, that the independent evidence corroborating Sergeant Lonetree's pretrial statements was substantial and established their trustworthiness. The corroboration supports the essential facts admitted in his pretrial statements sufficiently to justify a strong inference of truth with regard to them. Even excluding John Doe's testimony, the court-martial could "reasonably conclude from ... [the independent evidence] that appellant had told the truth at the time he gave his confession." *Melvin*, at 147.

Consequently, even without John Doe's testimony, we would have concluded that Sergeant Lonetree's guilt was established beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

name. The witness is also indicating that he cannot answer certain questions. In a case involving national security or classified information, which usually means both, there are some competing interests. They are the interest of the accused in a fair trial and his right to have all the information introduced into evidence that would be beneficial to him. There are some interests in the government of retaining classified information as classified. There are some procedures utilized and some were utilized in this particular case. There are different ways of presenting that information, one is the closed session such as we're in now. Another is to summarize information, delete certain information so that full information is not presented. In an effort to recognize to the fullest possible extent the interests of both, there are procedures whereby the government will ask, if they wish, to retain the classified nature of certain information. They will request that certain information not be divulged.

In that particular case, they have what is called an in camera procedure. When it comes to the reasons that they cannot tell, and the matters that they cannot tell, this information is provided to the judge in camera. It is not shown to the other parties. It becomes my task at that point to determine if the reasons that they do not wish to reveal this information are good reasons or not good reasons. It becomes my task to look also at the information that would be disclosed if the witness were permitted to disclose it. At that point I must make a decision as to whether it would be fair to the accused to withhold it, or unfair to the accused. If it can be determined that the information to be withheld would not be unfavorable or harmful to the accused, in that case rulings can be made which will permit retention of classifications, and the abridgment of some testimony.

In this particular case, such proceedings were held and I made certain rulings. *Because of the nature of that type of proceeding and because of the rulings that I issued in this case, I would advise you at this time that you cannot assume or infer that evidence favorable to the defense has been concealed or withheld, and the accused may not so argue in this particular case.* So, with that in mind, this particular witness will from time to time be declining to answer. Go ahead.

CC (Mr. Kunstler): You know we object to that instruction and to the law. We don't think that is the law and there is an objection by the defense.

MJ: Well, this was litigated, and I don't want to relitigate things that were litigated before.

CC (Mr. Kunstler): No, I know that, but I think if you're going to give an instruction like that—

MJ: I think, since the issue seems to be popping up repeatedly, that some explanatory information to the members is demanded at this particular time. So, with that in mind, perhaps this will—

R. 1700–01 (emphasis supplied).

Later at page 1718, the military judge, in response to a member's question concerning John Doe's testimony, advised the members:

MJ: All right. Well, I think it's fair to say that through instructions and arguments of counsel, you will be told what the significance of this is. Its significance is not affected in some way because of any summarization as you say, and *the weight, I will be instructing you, is to be whatever you wish to accord.*

The Government presented a proposed findings instruction that referred to the John Doe testimony. The defense had no objection and withdrew their proposed instruction. R. 1840–41.

A portion [15] of the John Doe credibility instruction reads as follows:

Under normal circumstances the defense has full opportunity to cross-examine a witness concerning his or her true name,

15. The initial part of the military judge's John Doe instruction is classified.

background and/or circumstances surrounding his or her testimony. In one respect, cross-examination into these matters assists you, the finders of fact, in determining the credibility of the witness. Therefore, you may consider the restriction I have placed on John Doe's testimony as well as the restriction of the defense's cross-examination in evaluating his credibility. If, after hearing John Doe's testimony and observing his demeanor, you have enough information to determine his credibility, then you may give such weight to his testimony that is commensurate with that determination.

R. 1930.

We conclude the military judge did not err when he instructed the members as to how to evaluate John Doe's testimony.

■ The military judge also restricted defense argument by stating they could not argue that the members could assume or infer that evidence favorable to the defense had been concealed or withheld because of limitations on cross-examination and limitations upon defense access to information about John Doe. R. 1701. During defense argument on the findings, at R. 1905, the military judge enforced his ruling:

TC: Your Honor, we object.

MJ: All right. I'm afraid references to that sort—

TC: Totally improper.

MJ: —of thing would be inappropriate.

. . . . .

MJ: Well—

CC (Mr. Kunstler): That's not disclosing any—

MJ: Well, there are reasons and I went into some detail before and I probably will do so again, why the witness did not respond. And comments that reflect criticism on the witness's refusal to answer, or that suggest that certain inferences should be drawn from that are inappropriate because they do not match up with the reasons why the witness did not testify.

CC (Mr. Kunstler): Well—

MJ: The Court made certain rulings with respect to that, and certain findings with respect to those rulings, so—

CC (Mr. Kunstler): They can draw—

MJ:—the inferences that you're suggesting just do not exist.

We note, however, that the defense was only restricted in inferring in argument that the information that was not disclosed to the defense or the members would have been favorable to the appellant. We agree with the military judge, after examining the complete record of trial, that adverse inferences should not have been permitted to be made by the defense in this limited area. However, even if there had been error, we would have concluded that the appellant was not prejudiced by the military judge's ruling.

### III

### ADMISSIBILITY OF CONFESSIONS

Appellant at trial moved to quash the statements he made during his debriefing by United States intelligence agents in Vienna and the confessions he made to Naval Investigative Service (NIS) agents in Vienna and London. Sergeant Lonetree asserts on appeal that the intelligence agents were required to advise him of his Article 31, 10 U.S.C. § 831 rights during the debriefing because it had merged with the NIS criminal investigation and because the debriefing was "in furtherance" of the military investigation. At the very least, appellant contends that the intelligence agents should have advised him of his 5th Amendment rights as required by *United States v. Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because, he argues, the debriefings were custodial interrogations. The law, as applied to the facts as we find them, does not support appellant. In analyzing this issue, we will first discuss Article 31 and then *Miranda*.

#### A. Facts

On 14 December 1986, at a Christmas party in Vienna, the appellant's desperate situation had built to a point where he felt he had to reveal his illegal activities with Soviet agents. Appellant approached and

asked to talk to Big John, who he knew to be a United States intelligence agent.[16] During the ensuing conversation, appellant revealed that while stationed in Moscow he had become involved with Soviet intelligence and that this involvement had carried over to his present duty station in Vienna. During this conversation, Big John, who was not a military servicemember nor in appellant's chain of command, did not inform the appellant of his Article 31 or *Miranda* rights. A second meeting was scheduled for the next day.

Before the second meeting Big John tasked a second intelligence agent, Little John, to debrief appellant and to determine what intelligence information had been compromised by appellant. Little John and Sergeant Lonetree agreed to conduct the debriefings at a local hotel in Vienna. Thereafter, appellant and Little John held six debriefing sessions over the next ten days. At the request of Little John, appellant voluntarily produced some of the correspondence received from Violetta Siena, Sergeant Lonetree's Soviet girlfriend. Little John testified that as he was performing a damage assessment function, and was not acting as a law enforcement agent, he did not provide appellant with either Article 31 or *Miranda* warnings. Little John, while advising appellant that it was in his best interest to cooperate in the debriefings, never made any promises to appellant; instead, he repeatedly emphasized to appellant that someone else would decide whether to initiate criminal charges.

Little John testified that the debriefings were scheduled for mutually convenient times, taking into account appellant's military duties and free time. Sergeant Lonetree was unescorted and used his own means to get to and from the hotel where the debriefings were held. He was not required to attend any of the debriefings and, in fact, appellant missed one debriefing that had to be rescheduled. From 14 December until 24 December, appellant's freedom was not restricted in any manner

and he continued to fully perform his duties as a Marine embassy security guard.

During the 10–day debriefing period, Big John and Little John communicated summarized reports of appellant's statements to their superiors by cable. The information contained in the cables was not provided to Naval Investigative Service Headquarters in Washington, D.C., until 22 December. On 23 December, the NIS office in London was instructed by its headquarters to begin a criminal investigation into appellant's activities; however, no information, including the cables, was at that time provided to the London office or to the assigned agents. On the morning of 24 December, three NIS agents from London met with Little John and Big John in Vienna. The NIS agents were provided the cables that had been sent to Washington from Vienna and examined them for the first time. At the time of this meeting, Little John and appellant had already scheduled a final debriefing for later that day. It was agreed that after this final debriefing, appellant would be introduced to the NIS agents who would then place appellant into custody for eventual return to London and then the United States. Both Little John and the NIS agents testified that the NIS agents did not give any advise or direction to Little John concerning the contents of Little John's final debriefing.

Shortly after the final debriefing, Little John gave to the NIS agents the letters from Violetta and the photos of Soviet agents appellant had identified. Appellant was then introduced to the NIS agents, who escorted him to another hotel in Vienna. (From the time of this introduction, Sergeant Lonetree was considered by the NIS agents to be in their custody.) At the second hotel, the NIS agents informed appellant of his Article 31 rights and gave him cleansing warnings. Appellant waived his rights, made a statement, and gave permission to the NIS agents to perform a search of his apartment in the embassy compound. The following day appellant

---

**16.** The true identity of Big John and Little John were revealed to the defense and to the members; the pseudonyms were only used in the record of trial to protect classified information.

was transported to London where, during the next four days, he executed two sworn confessions.

### B. Article 31 Requirements

■ As early as 1966 the United States Supreme Court recognized in the seminal case of *Miranda v. Arizona* that:

in our country the Uniform Code of Military Justice has long provided that no suspect may be interrogated without first being warned of his right not to make a statement and that any statement he makes may be used against him.

*Id.,* 384 U.S. at 489, 86 S.Ct. at 1635, 16 L.Ed.2d at 732. Thus, our Nation's highest Court observed that Article 31 of the UCMJ provided servicemembers such protection fifteen years before *Miranda* was decided.

Article 31 states:

(b) No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

To ensure that the protections of Article 31 are not circumvented by the simple subterfuge of employing an agent to do that which is forbidden for a person subject to the UCMJ to do, military law has expanded the plain language of Article 31 to include those persons who act as knowing agents of a military unit or a person subject to the code. Mil.R.Evid. 305(b)(1); *United States v. Grisham,* 4 U.S.C.M.A. 694, 696, 16 C.M.R. 268, 271 (1954). There are two situations in which a person will be found to be acting as a knowing agent of a person subject to the code for the purposes of Article 31. These are:

(1) When the scope and character of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity," and, (2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military." *United States v. Penn,* 18 U.S.C.M.A. 194, 199, 39 C.M.R. 194, 199 (1969) (citations omitted). We will discuss whether either of these two situations exist in the present case *seriatim.*

### 1. Indivisible Entity

In analyzing whether a civilian and a military criminal investigation have merged into one indivisible entity, military courts consider the purpose of each of the two investigations and whether they act independently. *United States v. Swift,* 17 U.S.C.M.A. 227, 38 C.M.R. 25 (1967). For example, a state employee's independent duty to investigate the social services aspect of sex abuse allegations on a military installation, and the fact that there was no military investigation in progress at the time, were dispositive in *United States v. Moreno,* 25 M.J. 523 (ACMR 1987). Judge Cox in *United States v. Jordan,* 29 M.J. 177 (C.M.A.1989), concluded that even though there was close coordination between local police and military criminal investigators, who often worked closely together, the investigations remained separate because they continued to represent only their respective sovereigns, and thus, neither side became an agent of the other.[17] *See also United States v. Sarkissian,* 841 F.2d 959 (9th Cir.1988) (under Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811 (1982), the Federal Bureau of Investigation can be engaged in an intelligence investigation that is separate and distinct from a criminal investigation with the result being that different responsibilities for conducting a surveillance exist).

The Court of Military Appeals in *Penn* stated that the "independent nature of concurrent civilian and military investigations may be so apparent from the record as to make manifest the inapplicability of Article 31." *Penn,* 18 U.S.C.M.A. at 201, 39

---

17. In *Jordan* the Court of Military Appeals applied the "indivisible entity" analysis to determine when Article 27, UCMJ, 10 U.S.C. § 827, (servicemember's right to competent and free legal representation) would be triggered in a civilian investigation.

C.M.R. at 201. Four dispositive factors were then identified by the Court in *Penn.* First, the entire investigation began with a report to the Secret Service and not to the military. Second, the Secret Service agents, in conducting their investigation, made their own determinations concerning the activities of the accused. Third, the steps taken by the military criminal investigators complied with the requirements of military law and not civilian law. Finally, the Secret Service agents testified that their investigation was entirely a Secret Service matter which the military had no control over at any point in time.

After examining the record of trial in Sergeant Lonetree's case, we find overwhelming evidence that the intelligence agents' damage assessment was entirely independent of the military's criminal investigation. When Sergeant Lonetree made his initial report to Big John, he knowingly stepped outside of his military chain of command. Big John and Little John analyzed appellant's activities for the purpose of ascertaining what damage may have occurred to the security of the United States and not for the purpose of perfecting a criminal prosecution.[18] Also, we find it important that the damage assessment was almost completed before the military criminal investigation began. Any coordination between the two investigations, including the communications which were shared with NIS pursuant to Executive Order No. 12333 [19] (which requires the sharing of information between agencies dealing with foreign intelligence) did not render the two investigations a single indivisible entity. Instead, the record clearly demonstrates that the two sets of investigators were at all times fulfilling their own unique duties and that neither side became the agent of the other. Furthermore, the NIS agents complied with the requirements of Article 31 before they interrogated the appellant. Finally, the testimony from all the agents involved in both investigations established that the military did not control or influence the civilian investigation at any point in time. Accordingly, we find that the civilian damage assessment inquiry and the military criminal investigation did not merge into an indivisible entity.

### 2. Instrument of the Military

The second instance in which civilian investigators are required to provide Article 31 advice is when they act as an instrument of the military. In *United States v. Quillen*, 27 M.J. 312 (C.M.A.1988), the Court held that a base-exchange detective was an instrument of the military when she stopped and questioned a suspect pursuant to her official duties to investigate crimes at the base exchange. The organization which employed the store detective and directed her actions was under the control of military authorities. *See also United States v. Kellam*, 2 M.J. 338 (AFCMR 1976).

The holding in *Quillen*, because of the obvious factual differences from the present case, is not controlling. Big John and Little John were not employed or directed by military authorities nor were they subject to the orders of military personnel. Their duty was not to investigate crimes of military personnel or crimes committed on military installations but was to learn the extent of any damage that may have occurred to the United States as a result of appellant's illegal activities. The actions of Big John and Little John were at all times consistent with their duty, which even though being governmental in nature, was not military in purpose.

Appellant argues that because Executive Order No. 12333 required information concerning foreign intelligence to be shared with the NIS, the intelligence agents conducting the debriefings became the instruments of the military, especially since Big John and Little John knew that a criminal investigation would be conducted by NIS

---

**18.** We note that the intelligence agents, Big John and Little John, are prohibited by law from conducting a criminal investigation or possessing law enforcement powers. We find that Big John and Little John, in determining what damage to national security appellant may have caused, did not violate this legal prohibition.

**19.** 46 Fed.Reg. 59941 (1981), *reprinted in* 50 U.S.C.A. § 401 note (1989).

and that the appellant would probably be prosecuted and severely punished for his actions. However, as held in *United States v. Aau*, 12 U.S.C.M.A. 332, 30 C.M.R. 332 (1961) and *United States v. Jones*, 6 M.J. 226 (C.M.A.1979), the existence of an understanding between military authorities and civilian investigators that a suspect will later be prosecuted by the military does not render the civilian investigators instruments of the military. Furthermore, the information actually received by the NIS agents conducting the criminal investigation did not play a substantial role in the completion of their investigation in light of Sergeant Lonetree's strong and continual willingness to confess to the NIS agents until after he had signed the second confession. *Cf. Kellam*, 2 M.J. at 342. The appellant received timely advice of his Article 31 rights and was given cleansing warnings by the NIS agents. He could have exercised his rights and remained silent, however, he voluntarily waived them and, with full understanding of his rights, executed the sworn confessions. The actions of Big John and Little John indicate that they were not instruments of the military for Article 31 purposes.

Lastly, appellant argues that when Big John and Little John met with the NIS agents on the morning of 24 December prior to the previously scheduled final debriefing, they became the instruments of the military and Article 31 rights should have been given to Sergeant Lonetree at the beginning of that final debriefing. The facts do not support this argument. Little John and all three NIS agents testified that they never discussed tactics, methods, or areas to cover at the 24 December meeting. Instead, they only discussed what appellant had revealed to date and how appellant would be introduced to the NIS agents. Accordingly, we find that the NIS agents did not assume direction or control of the final debriefing, and therefore, the intelligence agents were not required to advise appellant of his Article 31 rights before the final debriefing because they had not become instruments of the military.

## C. *Miranda* Requirements

The United States Supreme Court in *Miranda* summarized its historic holding:

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–07. However, there is no requirement that Government agents stop a person who wishes to confess to a crime or who wishes to make any other kind of statement. Volunteered statements of any kind are not affected by the

requirements enunciated in *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

In defining custody we note the analysis in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), that not all stops or seizures of a person are sufficient to trigger the giving of *Miranda* warnings. A simple traffic stop, which is analogous to a so-called *Terry*[20] stop, is a sufficiently temporary detention to be considered not "in custody." Such comparatively nonthreatening detentions do not have the same coercive aspects that are present with a formal arrest. The relevant inquiry is not what was the type of detention the Government agent intended, but instead, the only relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336.

■ In determining whether appellant was "in custody" when he admitted some of his wrongdoings to Big John and when he voluntarily agreed to attend the debriefings with Little John at the hotel in Vienna, we find compelling the similar facts and holding in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In that case the suspect voluntarily came to the police station where he was immediately informed that he was not under arrest. After a ½ hour interview, the suspect left the police station without any hindrance. The Supreme Court found that the record contained no indication whatsoever that the questioning of the suspect took place in a context where the suspect's freedom to leave the police station was restricted in any way. It is only when a person is no longer free to go where one pleases that he is being deprived of his freedom in a significant way. *See Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

In the present case, except for the normal performance of his Marine security guard duties, the appellant was free to go wherever he pleased and whenever he pleased. He was not under any form of military restriction nor were any limits placed on his liberty. The intelligence agents testified that appellant was never trailed or placed under any form of surveillance during the 10–day debriefing period. Appellant found his own way to and from the hotel where the debriefings were held; he was not escorted or accompanied to the meetings. Appellant was unable to attend one scheduled meeting because "he wasn't available at that time." (R. 335). We conclude that Sergeant Lonetree believed he was not deprived of freedom of action in any significant manner. It was not until the NIS agents formally placed appellant into custody on 24 December that a reasonable person in appellant's position would have understood that he was "in custody." Accordingly, we conclude that because appellant was not "in custody" when he voluntarily confessed to Big John and Little John, the appellant's rights as enunciated in *Miranda* were not violated.

### D. Holding

The military judge was correct in ruling that appellant's Article 31 and *Miranda* rights were not violated. Since the NIS agents properly advised appellant of his Article 31 rights, his sworn confessions were admissable at the court-martial.

### IV

### ALLEGED ERRORS IN ADMITTING EVIDENCE

■ Appellant, in two separate assignments of error, asserts the military judge erred in admitting: the testimony of appellant's high school teacher, Mrs. June Dahl; a high school notebook prepared for Mrs. Dahl as part of course work; an appendix entitled "Essentials of Leninism"; and testimony that appellant had taken Russian language classes in Moscow and Vienna.

Mrs. June Dahl, who, in 1979, was Sergeant Lonetree's eleventh grade high school American history teacher, testified for the prosecution. She testified that the cover of Lonetree's notebook, which he had submitted for her review, was marked by a huge swastika and the phrases: "6 million

**20.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

lies"; "holocaust is a lie"; "Jews are our misfortune", and "Hitler had the right idea!" The notebook also contained routine book reports and a "recruiting" poster for an organization characterized by the appellant as the Socialist Workers Party. None of appellant's course assignments focused on World War II, Nazis, or the Socialist Workers Party. Mrs. Dahl confronted Sergeant Lonetree concerning his views and he reaffirmed his anti-semitic viewpoint and emphatically stated he understood the meaning of a swastika. R. 1613. Sergeant Lonetree's admiration for totalitarian regimes did not end with his confrontation with his high school teacher. In 1983–1984, he consistently expressed to his Marine Corps roommate his desire "to have been a KGB agent, work for the KGB, because they were a real good spy organization; they were better than our CIA." R. 1343. In 1986, while stationed in Vienna, Austria, Sergeant Lonetree would continue to passionately defend totalitarian regimes. A witness testified:

> Sergeant Lonetree was defending communism and fascism, and mentioned the communist system, and Hitler's system and Mussolini's system as opposed to ours, which I defended as best as I could for the flaws that we have. I feel that our system was better, and he seemed to take an opposing view.

R. 1322. *See also* R. 1294.

Consequently, the prosecution, utilizing a thorough and comprehensive investigation by the NIS, showed long-held beliefs on the part of the appellant that were very relevant as to his intent and motive in committing the charged offenses. R. 824. These beliefs also rebutted defense assertions that appellant's involvement with the KGB was only an unfortunate aspect of his love for Violetta Seina and that he was motivated by an intent to outwit the KGB by discovering what information they were seeking. The military judge was correct, under the facts and circumstances of this case, in permitting the testimony of Mrs. Dahl and in admitting Sergeant Lonetree's high school notebook into evidence. *See* Mil.R.Evid. 401, 403. *Cf. United States v. Mann*, 26 M.J. 1 (C.M.A.1988).

A five page appendix, "Essentials of Leninism," apparently photocopied from a book, was seized from Sergeant Lonetree's room in Vienna. R. 1462. Although initially its admission was objected to by the defense (R. 820), the military judge reserved ruling. R. 824. When offered into evidence, the defense specifically stated they had no objection. R. 1465.

The defense also initially objected to admission of a practice sheet for a Russian language course. R. 820. The military judge also reserved ruling. R. 824. Apparently, the prosecution decided not to offer the practice sheet, except as handwriting exemplars. *See* R. 1608 and pages 31–42 of Prosecution Exhibit 50. Prior thereto, Master Sergeant Wingate testified, without objection, that Sergeant Lonetree requested and was authorized to study Russian while stationed in Moscow. R. 1090. Ms. Karen Cole testified, without defense objection, that Sergeant Lonetree continued Russian language classes, at his own expense, in Vienna. R. 1302. The defense, through the testimony of Corporal Luciano, then reaffirmed Sergeant Lonetree was taking these courses in Vienna. *See* R. 1551. *See also* R. 1553–54.

The defense waived objection to admission of the "Essentials of Leninism" appendix and the Russian language course testimony. Mil.R.Evid. 103(a). Even if the defense had preserved its objections, however, we consider this evidence to be relevant as part of a larger mosiac, reflecting Sergeant Lonetree's motive and intent in relation to the conspiracy and espionage offenses.

## V

### MULTIPLICITY FOR FINDINGS

Sergeant Lonetree was found guilty of five separate conspiracy offenses. Appellate defense counsel asserts the evidence shows only a single ongoing conspiracy and that all the specifications alleging conspiracy other than (originally numbered) Specification 1 of Additional Charge I must be dismissed. The Government joins with ap-

pellant to the extent of urging us "to consolidate all of the overt acts, members, objectives, and statutory violations in a single specification." We shall consolidate the other four conspiracy specifications into Specification 1 of Additional Charge I, as we need not dismiss those specifications which are incorporated into another specification. *United States v. Sorrell*, 23 M.J. 122, 123, n. 1 (C.M.A.1986).

Accordingly, Specifications 1 and 2 of Charge I, and Specifications 1 and 2 of Charge III, are consolidated into Specification 1 of Additional Charge I. Specification 1 of Additional Charge I is herewith amended to allege that Sergeant Lonetree committed all the violations of the Uniform Code of Military Justice and all of the alleged acts contained in Specifications 1 and 2 of Charge I and Specifications 1 and 2 of Charge III.

Appellant also asserts that all of the substantive specifications, with the exception of the Additional Charge II specification alleging a violation of Article 106(a), must be dismissed as multiplicious for findings. Government counsel also urges we dismiss Specification 5 of Charge III and all the specifications under Charge II, but that we affirm the remainder of the findings.

We concur with both counsel that Specifications 1 through 4 of Charge II are multiplicious for findings with the espionage specification alleged under Additional Charge II. *United States v. Baker*, 14 M.J. 361 (C.M.A.1983). We also concur that Specification 5 of Charge III should be dismissed because of the similarity of its elements to those of Additional Charge II. *Baker* at 368. However, Specifications 3 and 4 of Charge III contain different elements vis-a-vis each other and vis-a-vis Additional Charge II, and, therefore, they are not multiplicious for findings. *Id.; United States v. Carter*, 30 M.J. 179 (C.M.A.1990).

■ As regards multiplicity for sentencing, the military judge instructed:

There's an issue of some multiplicity in this particular case, and I will try to explain to you what that is. If an accused should, for example, commit a single act and that should, for example, be charged in two different ways, under two different statutes, this is a permissible practice, and if all the factors are present, he may, in fact, be convicted of those two specifications. But in certain circumstances, since you still are dealing with only one single act, when it comes time to determine punishment, you would no longer consider those as two separate offenses, you would take them all together and consider them as a single offense. This particular rule does not apply to conspiracies.

In other words, an agreement to commit a particular crime is not considered multiplicious by law with a conviction for actually committing that particular crime. In this case, however, certain groups of offenses are to be considered multiplicious.

For example, all of the conspiracy charges should be considered by you together, as one single offense, bearing in mind that you can consider all the facts contained in each specification in determining a suitable punishment. All the rest should be taken into account as a second group of offenses. This would be either because the acts in there are the same acts that are charged in different specifications, or they represent a single course of conduct. In any event, you should take the conspiracies and treat them together. You should—this does not mean that you're going to make more than one sentence in this particular case, it's just that in deciding the number of offenses that have been considered, you should group the conspiracies together and then you should group all the others together. In essence, because they are the two main types of offenses that you're concerned with.

Appellate defense counsel, quoting that part of the military judge's instruction on multiplicity beginning with "For example" asserts that the military judge did not instruct the members that there were "according to his own ruling, *only two* offenses for sentencing." Appellate Defense Brief at 87. Reviewing the military judge's

sentencing instructions on multiplicity as a whole, and in context, we conclude that he adequately advised the members that the conspiracy specifications, as a group, and the substantive offenses, as a group, were each single transactions and were each considered one offense for sentencing purposes.

## VI

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant was represented at trial by a defense team that consisted of military lawyers (Major David N. Henderson, USMC, and Captain Andy Strotman, USMCR) and civilian lawyers (Mr. William H. Kunstler and Mr. Michael V. Stuhff). On appeal, appellant now claims that the civilian members of his defense team, who were the lead counsel, provided ineffective assistance of counsel in the pretrial agreement negotiation and bargaining phase of the court-martial. Both appellant and the Government have submitted post-trial affidavits in support of their positions.

Essentially, the defense's assertions are: (1) appellant's civilian defense counsel failed to adequately inform appellant of pretrial agreement procedures and potential benefits in negotiating a pretrial agreement and of the probable outcome of the court-martial, and, (2) they dissuaded appellant from pursuing the recommendation of military counsel to negotiate a pretrial agreement by sabotaging the military coun-sel's relationship with appellant by maligning the military counsel's motives and loyalties.[21]

"There is no doubt that the sixth amendment's guarantee of a right to counsel must necessarily include the right to effective assistance of counsel." *Johnson v. Duckworth*, 793 F.2d 898, 899 (7th Cir. 1986), citing, *inter alia, United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Strickland v. Washington*, the Supreme Court set forth a two-prong analysis for determining when a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id.*, 466 U.S. 668, at 688, 104 S.Ct. 2052, at 2065, 80 L.Ed.2d 674, at 693 (1984). The reasonable performance inquiry examines all the circumstances present at the time of the counsel's decision, with due deference given to counsel to ensure that the distorting effects of hindsight are eliminated. The defendant, to be successful, must overcome the strong presumption that counsel's conduct fell within the broad range of "reasonable professional assistance."

Even when a defendant is able to overcome this strong presumption, relief will not automatically be given if that conduct had no effect on the trial. Therefore, the second requirement of *Strickland v. Washington* is that a defendant must show "there is a reasonable probability that, but

21. In his affidavit appellant states *inter alia:*

* Mr. Stuhff ... told me nothing that happened was my fault, and that I was not legally guilty. He said we had no choice except to fight and take the case to trial.

* Mr. Kunstler and Mr. Stuhff told me that I was legally innocent.... They kept assuring me that "we'll beat this," and said "we're going to party after this."

* Kunstler and Stuhff told me that the military, the State Department, and the Government had things to hide and were trying to make me a scapegoat. They also said the only way I could avoid this was by going public and going to trial. They told me that the Government was trying to "get me" because of my American Indian background, and told me we needed to show the public how the white man treated American Indians.

I told them that I did not think racial prejudice had anything to do with the case, but they told me I was wrong and that I should listen to them because they knew the facts and were more experienced than I was. They repeated that I should not listen to Major Henderson and should not plea bargain.

* They told me that the military was "out to get me," that Major Henderson and Captain Strotman did not have my interests at heart, and that I should remember that they "wore the same uniform as the people who were trying to get me and put me in jail."

* Mr. Stuhff and Mr. Kunstler repeatedly said that I hoped to be a "double-agent" and engage in counter-intelligence activities. I told them this was not true, but they told me it didn't matter because I should see that that might help my case.

for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694, 104 S.Ct. at 2067, 80 L.Ed.2d at 698. The remedy, if necessary, must be tailored to the specific error and must not interfere with the unaffected portions of the trial. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

### A. Reasonable Performance Inquiry

The use of pretrial agreements in modern criminal justice practice are a necessity and the Court of Military Appeals as well as the Manual for Courts–Martial recognize this reality. *United States v. Allen*, 8 U.S.C.M.A. 504, 25 C.M.R. 8 (1957); R.C.M. 705, MCM, 1984.

The American Bar Association in discussing the duties of a defense counsel require that:

> (a) After informing himself or herself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.
>
> (b) It is unprofessional conduct for the lawyer intentionally to understate or overstate the risks, hazards, or prospects of the case to exert undue influence on the accused's decision as to his or her plea.

A.B.A. Standards for Criminal Justice: The Defense Function, Standard 4–5.1, 2d ed.

The importance of advising a client of the right to negotiate a pretrial agreement and of the probable outcome of the trial is underscored by the commentary to Standard 4–6.1.

> Plea discussions should be considered the norm and failure to seek such discussion an exception unless defense counsel concludes that sound reasons exist for not doing so. In some cases the factual or legal situation or considerations of strategy may dictate that no overtures to

the prosecution be made. Ultimately, the definitive decision whether to engage in plea discussions is for the client, as is the decision of how to plead.

> In all circumstances, defense counsel should challenge the government's case if there is genuine doubt that the prosecution can carry its burden of proof. That the accused is guilty in fact is, of course, not relevant. It is not the function of the advocate to make a moral judgement as to the guilt of the accused.

*Id.*, Standard 4–6.1, Commentary, pp. 4.72–4.73.

■■■■ The Federal and state courts that have examined the issue have held that "an incompetently counseled decision to go to trial appears to fall within the range of protection appropriately provided by the Sixth Amendment." *Turner v. Tennessee*, 858 F.2d 1201, 1205 (6th Cir.1988); *see Johnson v. Duckworth; Larson v. State*, 766 P.2d 261 (Nev.1988); *Commonwealth v. Napper*, 254 Pa.Super. 54, 385 A.2d 521 (1978). Even though no military court has decided the issue, we agree with Federal and state opinions and hold that it would be a violation of an accused's Sixth Amendment right for a defense counsel to fail to fully inform and advise his client of the right to negotiate a pretrial agreement and to intentionally mislead his client concerning the probable outcome of the trial.[22] We must now determine if appellant has overcome the strong presumption that his civilian counsel professionally and competently fulfilled his obligations.

The affidavit submitted by Major Henderson indicates that appellant was informed of his right to negotiate a pretrial agreement. Furthermore, it is apparent from Major Henderson's affidavit that civilian counsel also considered negotiating a pretrial agreement and discussed the topic with appellant. The pertinent parts are:

---

**22.** In stating this rule of law we are not unmindful of the unfortunate effect it may have in future cases. It is possible that the Government could act in good faith at all times in a prosecution, be totally unaware of defense counsel's incompetence, and yet have the case reversed on appeal. *See People v. Whitfield*, 239 N.E.2d

850, 40 Ill.2d 308 (1968). However, it is more important to the military justice system that an accused be competently and professionally represented by counsel than it is to allow an accused to face the charges against him burdened by an ineffective defense counsel.

Sergeant Lonetree would tell me that he was ready to make an agreement, as he had done from the beginning, but would then, after discussion with civilian counsel, not press the issue.

The lead counsel, Mr. Stuhff, usually said that he was "willing to deal," but he always wanted to deal in terms of one or two or maybe three years. I told him from the beginning, that that was not even reasonable. My discussions with the trial counsel even in the beginning were in the realm of 5 to 10 years.

Affidavit of Major Henderson at 3. The affidavit further indicates that there were disagreements between counsel as to other aspects of the case, including strategy and tactics, but the issue of how to deal for a pretrial agreement was the most prevalent.

Appellant's affidavit [23] asserts that the relationship between the military and civilian counsel was at times strained. Appellant states that "Major Henderson suggested that Mr. Kunstler might not be right for the case and that he might be too radical." Affidavit of Clayton Lonetree at 2. Notwithstanding any disagreements between counsel on the subject of a pretrial agreement, it is clear from appellant's own affidavit that he had been advised of and was aware of his right to negotiate a pretrial agreement:

Prior to the trial, Major Henderson told me that he wanted to look into the possibility of a reduced sentence in return for a guilty plea. I agreed that he should negotiate a plea bargain. However, when I told Kunstler and Stuhff about what Major Henderson had said, they told me it would not be in my interest to negotiate or to plead guilty.

*Id.*, at 2–3.

Finally, we find that appellant's statement in his affidavit, that it was not until after the trial that he learned from other prisoners in the brig exactly how a pretrial agreement worked, to be self-serving and not credible. We believe that with all the

discussions appellant had with his civilian and military defense counsel concerning pretrial agreements that at least one of the four counsel explained the ramifications and effects of a pretrial agreement to him. Accordingly, we find ample proof that appellant had been fully advised of and was completely aware of his pretrial agreement rights.

 The appellant has not only failed to overcome the strong presumption that his counsel acted professionally, but the affidavits, and our review of the entire record, show that appellant in fact was competently represented by his four counsel. Appellant was involved in the discussions concerning negotiating a pretrial agreement from the beginning of his case. Simply because there was a difference of opinion concerning the amount of confinement that should be negotiated or concerning trial tactics and strategy does not render civilian counsel's advice incompetent, unprofessional, or ineffective. Appellant cannot claim as error the choices he made after being fully advised by his counsel of the possible options and probable outcome of his case. In hindsight, it may have been more advantageous for appellant to have attempted to negotiate a pretrial agreement prior to motion practice; however, from the facts as we view them, it is apparent that counsel's advice concerning a pretrial agreement and the probable outcome of the trial, at the time it was given, was not deficient and, therefore, appellant's right to effective assistance of counsel was not violated. *See Johnson v. Duckworth,* 793 F.2d at 902.

In holding that appellant was not denied effective assistance of counsel, we have examined the claim that civilian defense counsel sabotaged appellant's relationship with his military defense counsel. The affidavits reveal that, at times, the relationship between military and civilian counsel was strained. However, in reviewing the complete record of trial and noting the

---

**23.** Along with his briefs, appellant moved to file two affidavits in support of his claim of ineffective assistance of counsel. We granted the motion as to the affidavits with the limitation that

paragraph 2 of his affidavit would only be considered for the ineffective assistance of counsel issue and *not* for any other assigned error.

great extent to which military counsel actively and effectively participated in appellant's defense, we are convinced that the strain was no more than would be expected in a case of this magnitude and complexity. Disagreements between strong advocates as to tactics and strategy are not uncommon and we presume that the differences are settled professionally by counsel without jeopardizing the client's case.[24] There is no evidence that personal egos or interests tainted the counsel's loyalties, cf. *Larson v. State,* or their advice to appellant, cf. *Commonwealth v. Napper,* 385 A.2d 521, 254 Pa.Super. 54 (1978). Therefore, we find that appellant was represented effectively by a defense team that consisted of four competent and professional lawyers.

## B. Effect on Outcome

■ Even assuming that appellant had been able to overcome the strong presumption that his counsel had provided effective assistance and show that his Sixth Amendment rights had been violated, the findings of guilty would not have been tainted by the error. The only proper remedy that we could tailor to remedy the error would be to enforce the pretrial agreement that would have existed but for the counsel's incompetence. However, the appellant has failed to show what pretrial agreement terms would have existed had he negotiated a pretrial agreement. In the Government affidavits submitted on this issue, the chief trial counsel stated that during informal discussions with defense counsel a sentence limitation of approximately twenty years confinement was mentioned; however, he also states that no representative of the Government ever indicated that confinement less than twenty-five to thirty years would have been acceptable. Accordingly, we find that appellant has failed to show how the outcome of the trial would have been any different.

## VII

### APPROPRIATENESS OF SENTENCE

■ Appellant asserts that 25 years of confinement is inappropriately severe. We do not agree.

Espionage and conspiracy to commit espionage are very grave offenses. We believe the appellant's excellent military performance, difficult family life, and other extenuating and mitigating circumstances were taken into consideration when the members only awarded Sergeant Lonetree 30 years confinement when they could have sentenced him to life imprisonment. The convening authority reduced confinement to 25 years pursuant to a post-trial agreement by which the appellant agreed, *inter alia,* to submit to interrogations and polygraph examinations. The convening authority also notified the Clemency and Parole Board of the extent and nature of Sergeant Lonetree's cooperation. Sergeant Lonetree only reported his crimes when the pressure to provide more information and report to Moscow for further training reduced his options. When this occurred, his long-held belief in the superiority of totalitarian regimes faced the final test and he, finally, chose a "journey" back to his country. His sentence was fair and appropriate.

Specifications 1 through 4 of Charge II, and Specification 5 of Charge III are dismissed as we conclude they are multiplicious for findings. As the military judge considered these specifications multiplicious for sentencing, the appellant has not

---

**24.** If the civilian counsel had provided the ineffective assistance as claimed by appellant, it would have been the duty of the military counsel to remedy the situation as soon as they became aware of it and not wait until the appeal. The A.B.A. states that:

The traditional position of the bar that a lawyer must stand ready to challenge the conduct of a colleague where that is necessary to the protection of a client's rights is an essential of our system of justice. Nothing would be more destructive of the goals of effective assistance of counsel and justice than to immunize the misconduct of a lawyer by the unwillingness of other lawyers to expose the inadequacy.

A.B.A. Standards for Criminal Justice: The Defense Function, 2d ed., Standard 4–8.6, Commentary, p. 4.116.

It is a very good barometer of competence and professional representation that military defense counsel did not perceive that appellant was being denied his right to effective assistance of counsel during the trial.

been prejudiced. The remaining findings of guilty, including the consolidated specifications, and the sentence, are correct in law and fact. No error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the remaining findings, including the consolidated specifications, and, upon reassessment, applying the principles of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the sentence, as approved on review below, are affirmed.

Judges WILLEVER and STRICKLAND concur.

Senior Judges McLERAN and ALBERTSON did not participate.

FREYER, Judge (concurring in part, dissenting in part, and concurring in the result):

We concur in all but part II of the majority opinion. Since our disagreement with part II is extensive and varied, it has been necessary to address the issues in this separate opinion.

We agree with part II up to, but not including, the last paragraph of section C and would add two comments after footnote 9 at the end of section A.

First, our understanding of the military judge's responsibilities in conducting an *in camera* proceeding is that they include examining not only the Government's reasons for desiring to withhold the information in question but also the material to be withheld, itself, except in those rare cases in which a mere description of the material, together with the reasons for nondisclosure, would provide a sufficient basis for a ruling. This obligation on the part of the judge would seem to be especially critical when the information is not that which is already in the possession of the defense but which the Government seeks to withhold not just from the public but also from the defense.

Thus, in *United States v. Pringle*, 751 F.2d 419 (1st Cir.1984), the court made a point of noting that the Government's submission for the court's *ex parte in camera* examination included "the documents sought to be protected"; that the district court had "conducted an *ex parte in camera* inspection of the submitted material" before finding that "the surveillance information was neither helpful to the defense of the accused nor otherwise essential to a fair adjudication of the case...." Later in the opinion, the Court of Appeals indicated that they, too, had reviewed the classified material before concluding that it was not discoverable.

Similarly, in *United States v. Wilson*, 750 F.2d 7 (2d Cir.1984), the court noted:

As the Fifth Circuit did in *United States v. Wilson, supra*, 732 F.2d 404, we have reviewed the classified material at issue, and we similarly conclude that the district court did not err in rejecting the material under generally applicable evidentiary rules of admissibility.

In *United States v. Yunis*, 867 F.2d 617 (D.C.Cir.1989), the court notes:

We have, however, reviewed *in camera* the classified information which is the subject of the instant controversy and find that only two, or at most three, sentences or sentence fragments ... have even the remotest relevance to any issue in this cause.

In *United States v. Freund*, 525 F.2d 873 (5th Cir.1976), and *United States v. Doe*, 525 F.2d 878 (5th Cir.1976), two cases to which we invite particular attention, the court made clear the feasibility and, in appropriate cases, the necessity of examining a live witness in an *ex parte in camera* hearing. (In the court-martial context, it is expected that a *verbatim* record of such a hearing would be made, sealed, and attached to the record of trial.)

It is apparent from these cases that the trial court's responsibility is not limited to assessing the legitimacy of the Government's claim of secrecy. Bearing in mind that the court is unlikely ever to be in quite so good a position as defense counsel to evaluate the panoply of colorable contentions available to the defense, since the court is, nevertheless, charged with deciding whether or not certain information may be relevant and helpful to the defense, as well as with making, from among a variety

of options, the discretionary determinations required by Mil.R.Evid. 505(i), it stands to reason that, besides the issues in the case and the reasons for classification, the court ordinarily must know the *substance* of any information that the Government seeks to withhold.[1]

Second, for reasons explained later on, it appears to us, at least, that the language "relevant and necessary to an element of the offense or a legally cognizable defense" constituting the standard for disclosure in Mil.R.Evid. 505(i)(4)(B) is no higher than the "relevant and helpful to the defense of an accused, or ... essential to a fair determination of a cause" standard of *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and, furthermore, that it does not purport to exclude evidence that is relevant and helpful, or essential, solely on issues of credibility of government witnesses. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Our difficulty with the last paragraph of section C derives from a difficulty in ascertaining a definition of just what is meant by a balancing test. *Roviaro* is normally cited as the source of the balancing test. Has balancing occurred when a higher standard than bare relevance, *i.e., relevant and helpful*, is applied? Or does balancing not occur until the accused is deprived of evidence which is both relevant and helpful?

As we understand it, *United States v. Smith*, 780 F.2d 1102 (4th Cir.1985), the case most widely cited for the proposition that a balancing test is appropriate under CIPA, merely holds:

(1) that CIPA did not change the law of admissibility;

(2) that the pre-CIPA law of admissibility in the face of a government privilege always required the accused to meet a higher standard than bare relevance;

(3) that the error of the district court lay in failing to take into account that the

pre-CIPA law of admissibility in the face of a government privilege had always required the accused to meet a higher standard than bare relevance;

(4) that the *Roviaro* balancing test should be applied when the Government asserts the classified information privilege.

Thus, the *Smith* court concludes its opinion:

> We do hold, however, that we equate the disclosure of the classified information sought in this case with the disclosure of the various kinds of information sought about informers in the cases construing *Roviaro*. The *Roviaro* standard of *admissibility* is at the least more restrictive than the ordinary rules of *relevancy* would indicate.

780 F.2d at 1110.

In *United States v. Yunis*, 867 F.2d 617 (D.C.Cir.1989), a discovery case, the court denied that it was employing a balancing test, stating:

> Thus, we neither adopt nor reject the balancing test set forth in *Smith*, referenced in *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir.1988), and followed by the District Court in the present case. The resolution of that inquiry can await the day when we face a case in which a defendant seeks colorably privileged information with more than theoretical relevance which is genuinely helpful to his defense. This is not the case.

867 F.2d at 625.

Earlier in its opinion, the court had stated:

> We hold, in short, that classified information is not discoverable on a mere showing of theoretical relevance in the face of the government's classified information privilege, but that the threshold for discovery in this context further requires that a defendant seeking classified information, like a defendant seeking the informant's identity in *Roviaro*, is entitled only to information that is at least "helpful to the defense of [the]

---

1. The portion of this opinion which explains the application of the foregoing principles to the

specific facts of this case is classified.

accused," *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 628.

867 F.2d at 623.

Anticipating, perhaps, the contention that it had thereby employed the balancing test itself, the *Yunis* court added later in its opinion:

> We do not intend by our characterization of the second phase as requiring that the evidence be "helpful or beneficial" to direct a new test separate from the second step employed by the District Judge, styled by him as determining the "materiality" of the evidence. We recognize that that term is drawn directly from the Supreme Court's language in *Roviaro* and [*United States v.*] *Valenzuela–Bernal* [458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)]. However, in practical application of the test, the frequent confusion of the terms "materiality" and "relevance" in evidentiary law [footnote omitted] leads us to the conclusion that the Supreme Court's alternate phrasing of "helpful to the defense of an accused," provides more guidance in a trial context. *Roviaro,* 353 U.S. at 60–61, 77 S.Ct. at 628.

867 F.2d at 625.

*Roviaro* is classified as a balancing test case because of the following language:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

353 U.S. at 62, 77 S.Ct. at 629.

Although *Roviaro* prescribes "no fixed rule with respect to disclosure," what is often overlooked is that *Roviaro* does provide certain baseline considerations to be used in formulating the rule for a particular case. One of those is expressed as follows:

> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informant's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give away.

353 U.S. at 60–61, 77 S.Ct. at 628.

Consequently, any rule of disclosure produced by a balancing test which, as envisioned (but not adopted) in *Yunis,* deprived the defense of material that was relevant and genuinely helpful would be unthinkable under *Roviaro,* because it would violate a baseline consideration which the *Roviaro* court expressly prescribed for rules of disclosure, including those produced by balancing tests. The two cases cited by the *Smith* court, namely, *United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981), and *United States v. Harley,* 682 F.2d 1018 (D.C.Cir.1982), both go to great lengths to show how the defense had failed to demonstrate necessity because the evidence possessed no more than theoretical relevance, and because alternative means were available to, and in some cases used by, the defense to cover the same ground. Subsequent cases have followed the same reasoning. *See United States v. Van Horn,* 789 F.2d 1492 (11th Cir.1986); *United States v. Cintolo,* 818 F.2d 980 (1st Cir.1987); *United States v. Angiulo,* 847 F.2d 956 (1st Cir.1988).

The cases do not support a rule that the Government, by asserting its classified information privilege, may, without sanction, compel the defense to forgo evidence that is relevant *and* helpful to the defense *or* essential to a fair determination of the cause; the cases do, however, support the concept that evidence need not be deemed "helpful" if it is merely cumulative of evidence of the same matter which could be presented by alternative means consistent with the privilege so that the truth-seeking process would not be, in any degree, adversely affected. Sometimes the word "necessary" is used as synonymous with "helpful" in this context. This is what we think is meant by balancing.

The principle that balancing not deprive the party whose rights are being balanced of any advantage necessary for the truth-seeking process was recently emphasized in a different context. In *Maryland v. Craig,* — U.S. —, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) a bare majority of the U.S. Supreme Court balanced away nothing less than the Sixth Amendment right to confront a live witness, but, even in so doing, they restated this fundamental principle of balancing:

> As we suggested in *Coy* [*v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)], our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied only where denial of such confrontation is necessary to further an important public policy *and only where the reliability of the testimony is otherwise assured.* (Emphasis supplied.)

Insofar as Mil.R.Evid 505(i)(4)(B) includes a balancing test, it would appear that the defense in trials by court-martial has been operating under a balancing test for a long time. In discussing the standard for subpoenaing witnesses in trials by court-martial *even in the absence of any claims of privilege whatsoever,* the U.S. Court of Military Appeals has held:

> This right, however, is limited to the extent that, as a condition precedent to the issuance of process, the testimony of any witness requested by the defense must be shown to be material and necessary. More particularly, the defense must aver that the requested witness would offer testimony to negate the government's case or support the defense.

*United States v. Roberts,* 10 M.J. 308 (C.M. A.1981) (citations omitted). If that standard is different from the standard of Mil. R.Evid. 505(i)(4)(B), we fail to see how. Similarly, the Discussion under Rule for Courts–Martial 703(b)(1), Manual for Courts–Martial, United States, 1984, commenting on the "relevant and necessary" language of that rule, states, in part: "Relevant testimony is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." If that sounds like the "relevant and helpful" standard of *Roviaro,* it probably should. *See also United States v. Credit,* 8 M.J. 190 (C.M.A.1980).

Having set forth our view in the above terms, we decline to join in section D of the majority opinion.

For the reasons set forth at length in the classified portion of this opinion, we do not join in section E of the majority opinion. Notwithstanding what we regard as serious deficiencies in compliance with the letter and especially the spirit of Mil.R.Evid. 505, we are satisfied beyond a reasonable doubt that the appellant was not prejudiced. For one thing, the testimony of John Doe was not uncorroborated; it was corroborated by the appellant's own confession, which it, in turn, corroborated. In addition, there was ample other evidence to corroborate the confession.

Having determined that instructional error occurred with respect to the military judge's embellishments on what was intended as a no-adverse-inference instruction, we disagree with section F of the majority opinion.

The subject of whether the exercise of a privilege rates an adverse-inference instruction, a no-adverse-inference instruction, or no instruction at all is controversial. It is discussed at length in 34 A.L.R.3d 775, but the annotation contains no reference to the classified information privilege. In a proper case involving a patently good-faith exercise of the classified information privilege, a no-adverse-inference instruction does not seem at all unreasonable, although it may not, under the circumstances, be necessary. We do not disagree that such an instruction may have been advisable in this case, but we do find fault with the particular instruction given, both because it contains false assurances, and because it goes beyond a simple no-adverse-inference instruction so as to invade the province of the triers of fact. While we recognize that instructions must be read as a whole, the whole is equal to the sum of its parts, and it is necessary at

times to parse instructions for incorrect statements that are potentially prejudicial, and this is one of those times. The underlined quotations that follow are from the military judge's instruction on page 1701 of the record of trial.

"When it comes to the reasons that they cannot tell, and the matters they cannot tell, this information is provided to the judge in camera." As indicated in the classified portion, there were significant gaps in both the reasons and the matters that were provided to the military judge in camera.

"It becomes my task at that point to determine if the reasons that they do not wish to reveal this information are good reasons or not good reasons." This task was only partially performed, because, as indicated in the classified portion, the Government was not required, as to certain matters, to reveal their reasons. In addition, the suggestion that the military judge had determined that the Government had good reasons for not revealing the information that the members knew by generic category was being withheld from them, because John Doe was allowed to invoke the privilege in their presence, was, in effect, the virtual negative of a Grunden instruction.

"It becomes my task to look also at the information that would be disclosed if the witness were permitted to disclose it." This statement, while true, implied that the military judge had performed that task, when, as shown by the classified portion, he had not personally examined some of what he allowed the Government to refuse to disclose, allowing, instead, the witness to decide for himself what questions he would or would not answer.

"At that point I must make a decision as to whether it would be fair to the accused to withhold it, or unfair to the accused. If it can be determined that the information to be withheld would not be unfavorable or harmful to the accused, in that case rulings can be made which will permit retention of classifications, and the abridgment of some testimony." (The second sentence in this quotation appears not

quite right but designed to create the impression that the withholding of the information, vice the information to be withheld, was not unfavorable or harmful to the accused.) This was the critical statement which both provided false assurances to the members that the military judge had, indeed, examined all the Government's reasons and the substance of the matters withheld, and laid the foundation for invading their fact-finding province.

In no case that we have found in which a judge has given a no-adverse-inference instruction has the judge gone beyond that instruction so as personally to vouch for the information concealed by the privilege. The function of a no-adverse-inference instruction, as we understand it, is simply to *neutralize* whatever adverse inference might otherwise be drawn from the *fact of non-disclosure*, not to characterize the information not disclosed as favorable, or, at least, not unfavorable, to the side invoking the privilege. Since any determination of the weight or effect of such information, if admitted into evidence, would belong exclusively to the triers of fact, it is, a *fortiori*, not the place of the military judge to alter the evidentiary landscape by exposing the triers of fact to his own conclusory assessment of the weight or effect of matters not even admitted into evidence. In our opinion, the challenged instruction, whether taken as a whole or piece by piece, did just that and was, therefore, error.

The findings instruction on John Doe's credibility could not have cured the error, because the error tainted that findings instruction in such a way as to affect the very manner in which it would be applied. Included in the information which the members had, on the basis of which they were instructed to decide if they had enough information to determine John Doe's credibility, were the military judge's improper assurances that he had examined all the interstitial information omitted from John Doe's testimony, and his judicial assessment of that information as not adverse to the Government nor favorable to the defense. Consequently, even though there was no separate objection made to the find-

ings instruction, a separate objection was not required because that instruction was not separately erroneous. Because the erroneous instruction that tainted the findings instruction had, indeed, been the subject of a proper and timely objection, the matter was not waived.

In consonance with the view that it is not necessarily error to give a no-adverse-inference instruction in a proper classified information privilege case, we assume that it was not necessarily error to preclude the defense from asking the members in argument to draw an adverse inference against the Government for its exercise of that privilege in this case.

Having examined the record of this trial in detail, we are singularly impressed by the thoroughness of the case presented by the Government and the overabundance of proof of guilt. Taking into account that all the errors identified in this opinion, including the classified portion, concern the testimony of a single witness far less important to the case than the legal issues raised by his appearance would indicate, that they arose in the context of corroborating an otherwise adequately corroborated confession, and that the other evidence of guilt is overwhelming, we are completely satisfied that the errors which we have identified and discussed did not affect the outcome of this case at all. Accordingly, we join the majority without reservation in affirming the findings of guilty and the sentence as approved on review below.

Judge LANDEN concurs.